IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

DONALD O.,[1]                    )
      Plaintiff,              )        Civil Action No. 4:20-cv-00054
                              )
v.                               )        REPORT & RECOMMENDATION
                              )
COMMISSIONER OF SOCIAL           )        By:   Joel C. Hoppe
SECURITY,                        )              United States Magistrate Judge
      Defendant.              )

Plaintiff Donald O. asks this Court to review the Commissioner of Social Security's final

decision denying his application for disability insurance benefits ("DIB") under Title II of the

Social Security Act, 42 U.S.C. §§ 401–434. This case is before me by referral under 28 U.S.C. §

636(b)(1)(B). ECF No. 5. Having considered the administrative record, the parties' briefs, and

the applicable law, I cannot find that the Commissioner's final decision is supported by

substantial evidence. Accordingly, I respectfully recommend that the decision be reversed and

the case be remanded under the fourth sentence of 42 U.S.C. § 405(g).

## I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see*

*also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.

2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only

whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the
United States has recommended that, due to significant privacy concerns in social security cases, federal
courts should refer to claimants only by their first names and last initials.

substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See*

*Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th

Cir. 2017); 20 C.F.R. § 404.1520(a)(4).[2] The claimant bears the burden of proof through Step

Four. *Lewis*, 858 F.3d at 861. At Step Five, the burden shifts to the agency to prove that the

claimant is not disabled. *See id.*

## II. Procedural History

In March 2018, Donald filed for DIB, alleging he was disabled by sciatica, chronic back

pain, lumbar spondylosis, L3-4 disc bulge, L4-5 right foraminal annular tear, and cervical

radiculopathy at C6. Administrative Record ("R.") 135–36, 149, ECF No. 11. Donald was fifty-

five years old, or a "person of advanced age" under the regulations, on his alleged disability

onset date of October 21, 2016. *See* R. 12, 157; 20 C.F.R. § 404.1563(e). Disability

Determination Services ("DDS"), the state agency, denied his claim initially in September 2018,

R. 79–87, and upon reconsideration in March 2019, R. 90–97. On August 1, 2019, Donald

appeared with counsel and testified at an administrative hearing before ALJ Theodore Kennedy.

R. 57–76. A vocational expert ("VE") also testified at this hearing. R. 70–73.

ALJ Kennedy issued an unfavorable decision on August 19, 2019. R. 12–20.  He found

that Donald's degenerative disc disease ("DDD") of the spine was his sole "severe" medically

determinable impairment, R. 14, and that this impairment did not meet or medically equal the

corresponding Listing, R. 15 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.04). Turning to the

RFC, ALJ Kennedy found that Donald could perform "medium work . . . except"[3] he could:

---

[2] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

[3] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds, 20 C.F.R. § 404.1567(c), and "standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent[ly] lifting or carrying objects weighing up to 25 pounds. . . . [S]itting may occur intermittently during the remaining" two hours, SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983). *See Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018).

lift and carry 25 pounds frequently and 50 pounds occasionally. He [could] sit, stand and walk for six hours in an eight-hour day. [He could] constantly push or pull at the medium level o[f] exertion. He [could] frequently climb stairs or ramps, balance, kneel, crouch or crawl . . . [and] occasionally climb ladders, ropes or scaffolds, or stoop. He [could] occasionally be exposed to unprotected heights.

R. 15.[4] This RFC finding's "postural and environmental" limitations ruled out Donald's return to his past work as a certified electrician. *See* R. 18–19 (finding that this job generally is considered "medium" exertion work). Based on the VE's testimony, however, ALJ Kennedy found that Donald could transition to other "medium" work (linen clerk, dishwasher/kitchen helper, dietary aide) existing in significant numbers in the national economy. R. 19. Accordingly, he concluded that Donald was not disabled between October 21, 2016, and August 19, 2019. R. 20. The Appeals Council declined to review that decision, R. 1–3, and this appeal followed.

### III. Discussion

Donald raises three arguments challenging ALJ Kennedy's decision. *See generally* Pl.'s Br. 7–16, ECF No. 16. He argues that ALJ Kennedy (1) erred as a matter of law by rejecting Donald's reports of symptoms and limitations at step two of the *Craig v. Chater* pain analysis solely based on objective evidence; (2) failed to account for Donald's difficulty in concentrating from his pain; and (3) erred by basing his RFC finding solely on Donald's physical functioning, and by ignoring that "pain itself can be disabling." *Id.* Donald's first argument is persuasive and requires reversal and remand. As such, I will address only his first argument.

*A.    Summary*

*1. Relevant Medical Evidence*

---

[4] The ALJ did not indicate whether he found that Donald could sit, stand, and walk for a total of six hours in an eight-hour day or perform each activity for six hours. On remand, the ALJ should make specific, clear findings as to Donald's impairment-related limitations in performing each physical function for eight-hours a day, five day per week. *See* SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).

Donald has regularly reported suffering from chronic back pain. On February 26, 2016, prior to his alleged onset date, Donald saw his primary care physician, Michael Waters, M.D., for a follow-up appointment concerning his degenerative joint disease ("DJD") and chronic neck and back pain. R. 286–88. Donald reported working, and he complained to Dr. Waters of chronic back pain that "drain[ed] the life out of [him]" and radiated into his legs. R. 286. Donald said that Percocet and fentanyl patches were not effectively relieving his pain and that regular-strength ibuprofen worked better. *See* R. 286–87. On examination, Dr. Waters noted 3/5 strength throughout, mild thoracic kyphosis, and normal gait. R. 287. He assessed other intervertebral disc generation, lumbar region, refilled the fentanyl patches, and replaced Percocet with Oxycodone for Donald's breakthrough pain. *Id.*

Donald again saw Dr. Waters on August 26 and complained of chronic pain. R. 283. Donald still worked as an electrician at the time of the visit. *Id.* He told Dr. Waters that a new brand of fentanyl patches were ineffective, that he had stopped using them and was experiencing withdrawals, and that he had been taking more Oxycodone instead. *Id.* Dr. Waters's examination findings were the same; he assessed degenerative joint disease and chronic back pain, and he ordered refills of fentanyl patches and Oxycodone. R. 284. On October 17, Donald visited with Dr. Waters to evaluate his anemia and discuss existing prescriptions. R. 279–82. He reported that his prescriptions for fentanyl patches and Oxycodone had been returned to him by his mail-order pharmacy because he tried to refill them too early, and he requested Hydrocodone in the interim. R. 279. Donald did not report any symptoms relevant to his back impairments, and Dr. Waters's examination findings were unchanged. R. 279–80. Dr. Waters assessed chronic pain, DDD, and DJD, and he continued Donald on fentanyl patches and Oxycodone. R. 280–81.

On January 13, 2017, shortly after quitting his job as a lead electrician, Donald told Dr.

Waters that he was trying "to get pain relief and reduce his narcotic intake if possible." R. 275.

Donald had stopped using fentanyl patches and was seeing a chiropractor, which "seem[ed] to

help." *Id.* He was still taking Norco and Oxycodone. *Id.* On examination, Dr. Waters noted

lumbar muscle spasm, negative straight leg raising test, normal spinal curvature, 4+/5 strength in

the lower extremities, and normal gait. R. 276. Dr. Waters assessed chronic pain, R. 276, ordered

refills of Oxycodone and Norco, *id.*, and noted that Donald had been approved for fentanyl

patches through June 27, 2017, R. 275.

On April 13, Donald saw Jennifer Edwards, N.P., on referral from Dr. Waters. R. 200–

04. Donald reported "constant" neck pain that had "gotten worse over the past year" as well as

reduced range of motion and numbness in the right arm. R. 201. But his neck pain was "not as

bad" as his chronic lower-back pain, which he described as "constant" 7/10 pain that radiated

down his right leg. *Id.* He denied lower-extremity weakness or numbness. *Id.* NP Edwards noted

stable gait, full lower-extremity strength, and sensation intact to light touch. R. 202. Citing

Donald's right radicular pain, she ordered an MRI of the neck and lumbar spine. *Id.* The cervical

MRI showed "degenerative changes," R. 272, including cervical facet disease at C2-T1 and

"mild" to "moderate" abnormalities at C3 through T1, *see* R. 199.

On June 13, Donald followed up with Dr. Waters for his lower back pain. He reported

that after five weeks of physical therapy ("PT"), his lower back pain had worsened. R. 272.

Donald said he was "hoping to get better [pain] relief so that he might" be able to go back to

work as an electrician and maintenance worker. *Id.* Dr. Waters noted again that Donald had been

seeing a chiropractor and reported that it "seem[ed] to be helping some for his pain," but he

complained of "pain radiating down" the right leg "with standing, walking, or at other times and

6

especially with physical therapy." *Id.* On examination, Dr. Waters found lumbar muscle spasm, 4+/5 upper extremity strength, 4/5 lower extremity strength, and normal gait. R. 273. Donald's straight leg raising test of the left leg was negative; but it was positive on the right. *Id.* ("Straight Leg Raising test: negative, positive on the right, approx 90 degrees."). Dr. Waters assessed sciatica and seropositive rheumatoid arthritis, and he ordered a refill of Oxycodone. R. 273–74.

On June 29, Donald had an MRI of the lumbar spine. R. 203–04. The reviewing physician noted in his impression, "[v]ery mild lumbar degenerative changes with low grade narrowing of the right L3-4 and L4-5 neural foramen." R. 204. Dr. Waters later opined, "I would assume that these areas are his pain generators." R. 266 (noting MRI showed "minimal" disc protrusion and narrowing at L3-4 to L4-5) (Oct. 2017). Donald also followed up with NP Edwards on June 29. R. 198–200. He reported pain levels of 7/10, reported no changes in his symptoms, and complained of lower back pain radiating into his right buttock and thigh, neck pain, and headaches. R. 199. Donald had undergone six weeks of PT, but stated that it was ineffective, and refused further PT. *Id.* Additionally, Donald had received chiropractic care, but said that it helped only with his range of motion and did not alleviate any pain. *Id.*

Between August 9 and October 9, 2017, Donald saw James A. Dailey, M.D., on five occasions to receive transforaminal lumbar epidural steroid injections. *See* R. 211–21. During the initial visit, Donald reported back pain radiating to his thigh and described his symptoms as moderate in severity. R. 221. Donald informed Dr. Dailey that his lower back pain had been present for about seven to ten years, that it was exacerbated by standing, and that his symptoms were relieved by opioid analgesics. R. 222. Except for positive straight leg raising tests, examination findings were normal. R. 214, 222. During Donald's final visit, Dr. Dailey noted

that Donald "does not feel that the injection therapy has helped" and has a pain level of seven or eight out of ten most of the time. R. 213.

On September 12, 2017, Dr. Waters noted that Donald reported no improvement from injections. R. 268–71. According to Donald, the injections "wiped all the medicine out of my body . . . [and] hurt like hell." R. 269. Donald still had pain in his lower back that "may radiate to the right leg" if he got "jolted." *Id.* "Standing or sitting for a time ma[de] it worse" and "[w]alking ma[de] it worse over time." *Id.* Donald said that narcotic analgesics, while seemingly helpful, "drain[ed] the living life out of [him]." *Id.* Lying down in a fetal position could help as well. *See id.* ("Lying down can make it better if in the right position."); R. 266 ("Resting in a fetal position apparently provides relief."). Examination findings were unchanged. Dr. Waters assessed lumbar spinal stenosis, and he prescribed fentanyl patches and Oxycodone. *Id.* In October, Donald indicated that he had been offered work at the manufacturing plant where he used to work in maintenance. *See* R. 266. However, the "type of work" offered was "something [Donald] ha[d] been unable to do." *Id*. He reported "fairly constant" lower back pain that was "worse with walking or standing" and "sitting in certain types of chairs." *Id.* Donald had "good pain relief" with Fentanyl patches and Oxycodone, but his mail-order pharmacy refused to fill the last Fentanyl prescription. *Id.*; *see* R. 268 ("Will work on getting prior authorization for Fentanyl."). In December, Dr. Waters noted that Donald's pain was "fairly constant and worse with walking or standing," R. 266, but "stable with current medication and activity," R. 263. Donald's back pain was stable in April 2018. R. 260–62.

In August 2018, Donald visited Christian Estrada, M.D., of the Center for Physical Medicine and Pain Management, three times. *See* R. 328–34. During his final appointment with Dr. Estrada, on August 27, Donald reported "constantly" experiencing pain in his "lower back,

8

left lower extremity and right lower extremity." R. 329. He described his pain as "sharp, dull, aching, burning, stinging and throbbing" and stated that his symptoms were relieved by rest and opioid analgesics, and worsened by activity, work, and fatigue. *Id.* Donald's "[a]ssociated symptoms include[d] depression, anxiety, irritability, difficulty concentrating and sleep disturbance." *Id.* He described his pain as a 7/10 and stated that his pain had been ongoing for about twelve to fifteen years and was not caused by any trauma or inciting event. *Id.*

Dr. Estrada's examination findings showed normal strength and reflexes, normal gait, negative straight leg raising test, no spine tenderness, and normal range of motion. R. 331; *see* R. 332 ("On exam, patient is neuromuscularly intact with intact range of motion of the lumbar spine and straight leg raise negative."). Dr. Estrada noted that MRI results showed "very mild lumbar degenerative changes with low grade narrowing of the right L3-4 and L4-5 neural foramen." R. 332. He concluded that there were "no clear examination findings that indicate the need for high-dose opioid therapy," *id.* (finding "no clear indication" why Donald "requires high-dose opioid therapy given the minimal findings on MRI and relatively normal physical exam"), and he advised Donald that "he will need to begin weaning off the fentanyl patch and oxycodone," *id.* (citing increased risk of respiratory depression and death). Lastly, Dr. Estrada noted that Donald was offered epidural injections to target his radicular symptoms, but "declined interventional pain therapy stating [it] did not work in the past." *Id.*

On August 30, 2018, Donald established care with Christina A. Pavelko, D.O. R. 343–46. Dr. Pavelko noted that the pain clinic had told Donald that he needed to wean off opioids. R. 343. On examination, Dr. Pavelko noted spinal tenderness, but otherwise normal findings. R. 345. Dr. Pavelko assessed sciatica and chronic back pain, prescribed Oxycodone and a reduced amount of fentanyl patches to begin weaning Donald's use. R. 345.

9

2.      *Donald's Statements*

In August 2018, Donald told a DDS employee that "his functioning varies considerably based on [his] pain levels." R. 81. Even with long-term opioids, however, his "ability to stand in one place [was] 'minimal'" and his right leg felt heavier than his left. *Id.* ("He feels as if there is a wire from his back to the leg."). He could drive, but he did not like to because "it hurts" and he could not "sit normally." *Id.* ("He sits in odd positions with pillows in different spots in order to get comfortable, he does not feel he can sit normally."). Donald could do "basic" activities of daily living if he stopped to rest. *Id.*

Donald testified at the hearing before ALJ Kennedy on August 1, 2019. R. 59. He was 58 years old and lived with his wife and sixteen-year-old son. R. 61. Asked why he could not work full-time anymore, Donald said, "[i]t feels like a Number 2 Phillips screwdriver is stabbed into my back. The pain runs down my leg. It drains the energy out of me. And then it really kicks in it feels like I'm getting electrocuted in my back." R. 64; *see* R. 81.

When Donald's employer was bought out, his pain medication was changed. R. 65; *see* R. 283. This forced him to stop working because "the pain medicine [he] was taking [was] what was allowing [him] to work when [he] was working." R. 65. Donald could no longer get his pain medication because his doctor retired, *id.*; *see also* R. 81, and "the government started cutting back on the use of opioid pain medicine because that's a big no-no nowadays," R. 65. Donald could drive, but he did not "like to drive because it hurts." R. 66; *see also* R. 81. He tried physical therapy and injections without much relief. *See* R. 64, 67. Donald still had "trouble doing about anything," including lifting/carrying, bending, sitting, standing, and walking. R. 68. He could not walk "for long" and when sitting he must "constantly change up and squirm to try

10

to get a better position." *Id.* He could lift a gallon of milk and place it in the refrigerator, and he could stand for "maybe" fifteen minutes before needing to sit down. R. 69.

    *3.    Medical Opinions*

    In September 2018, DDS medical expert Wyatt S. Beazley, III, M.D., reviewed Donald's record. R. 79–87. Dr. Beazley opined that Donald's severe DDD of the cervical and lumbar spine with chronic pain and opiate use, R. 82, 84, limited Donald to occasionally lifting/carrying twenty pounds and frequently lifting/carrying ten pounds; sitting and standing and/or walking for about six hours each (with normal breaks) in an eight-hour workday; occasionally climbing ramps or stairs, stooping, kneeling, crouching, and crawling; and never climbing ladders, ropes or scaffolds, R. 84–85. Donald also needed to "[a]void even moderate exposure to hazards" to accommodate "[c]hronic pain and opioid use." R. 85.

    DDS medical expert Daniel Camden, M.D., provided a less restrictive opinion after reviewing Donald's records in February 2019. Dr. Camden opined that Donald's severe DDD of the cervical and lumbar spine with chronic pain and opioid use, R. 93, 95, limited him to occasionally lifting/carrying fifty pounds and frequently lifting/carrying twenty-five pounds; sitting and standing and/or walking for about six hours each (with normal breaks) in an eight-hour workday; frequently climbing ramps/stairs, balancing, kneeling, crouching, and crawling; and occasionally stooping and climbing ladders/ropes/scaffolds, R. 94–96. Donald did not have any environmental limitations. R. 95. Dr. Camden did not explain why he disagreed with Dr. Beazley's more restrictive medical opinion.

*B.    The ALJ's Decision*

In determining Donald's RFC, ALJ Kennedy summarized some of Donald's subjective statements regarding his symptoms, summarized the medical evidence, and evaluated the medical opinion evidence of record. R. 16–18. He found that Donald's "medically determinable impairment could reasonably be expected to cause the alleged symptoms," but that Donald's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained [elsewhere] in [the ALJ's] decision." *Id.*

First, "[t]he objective medical evidence [did] not support disability" from back pain. R. 18; *see* R. 17 ("As shown above, the claimant alleges he is disabled due to back pain, but [t]he evidence does not support disabling limitations."). Some examinations showed "mild physical findings" like slightly reduced strength, "tenderness, muscle spasms, some reduced range of motion at the lumbar spine, and a positive straight leg rest at 90 degrees," but those "findings were not significant and not persistent through the record." R. 17; *see* R. 18 (finding that Dr. Waters's exam notes "support continued abilities, as [Donald] had mildly reduced strength and range of motion," and that Donald "remains functional, as the physical examinations do not support persistent or significant deficits"). "These mild physical findings were not seen during [Donald's] pain management appointments," for example. R. 17; *see* R. 18 ("The claimant was found to neurovascularly intact, and he had normal range of motion and strength.").

Second, the "mild physical findings along with minimal radiological findings [did] not support the use of opioid medication." R. 18. Rather, the "use of opioids appears to be in response to [Donald] saying other forms of pain medication were ineffective." *Id.* Donald also "declined physical therapy and injection treatment, although that is all the objective findings and deficits call[ed] for." *Id.* Nor was there any "suggestion of surgery" or "need to use a brace or

12

assistive device to walk." *Id. But see* R. 16 ("He has tried injection treatment to cut back on using the pain medication, and there is no surgical treatment to fix his pain. . . . [He] said that he did not improve with physical therapy and the chiropractor only improved his range of motion but not his pain.").

Assessing the medical opinions, ALJ Kennedy found Dr. Beazley's opinion, which had restricted Donald to "light" work with some "occasional" postural and environmental limitations, "not persuasive, as it is not entirely consistent with the objective medical record, as there is no evidence of significantly or persistently reduced upper extremity strength or limitations at the neck or shoulder." *Id.* (citing R. 84–86). On the contrary, Donald's "strength was 4+/5" and even this "was not a persistent finding. The notes from pain management show he had normal strength, sensation, and range of motion." *Id.* Regarding Dr. Camden's opinion that Donald could perform "medium" work and "frequent" postural activities, ALJ Kennedy found it "persuasive, as it is consistent with the objective medical evidence, showing minimal strength limitations in the lower extremity, normal range of motion, and normal sensation." *Id.* (citing R. 94–95).

The ALJ then concluded that the "evidence of record as a whole," particularly the objective medical evidence and medical opinions, supported his RFC finding, R. 18, that Donald could lift/carry 25 pounds frequently and 50 pounds occasionally; "sit, stand and walk for six hours in an eight-hour day"; "constantly push or pull at the medium level o[f] exertion"; frequently climb ramps/stairs, balance, kneel, crouch, or crawl; and occasionally climb ladders/ropes/scaffolds and work near unprotected heights, R. 17. Based on that RFC determination and the VE's hearing testimony, the ALJ found that, although Donald could not

perform his past relevant work, he could perform other jobs existing in the national economy and, thus, was not disabled. R. 18–20.

C.    *Analysis*

Donald challenges ALJ Kennedy's RFC determination, asserting that he relied solely on objective medical evidence to discount Donald's reports of pain and alleged functional limitations, Pl.'s Br. 7–13, failed to account for Donald's difficulty concentrating because of pain, *id.* at 13, and based his RFC finding solely on Donald's physical functioning while ignoring that "pain itself can be disabling," *id.* at 13–14. Donald argues that "'the ALJ cannot disbelieve the claimant's testimony solely because it seems in excess of the objective medical testimony.'" *Id.* at 7 (quoting *Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006)) (cleaned up). I agree that ALJ Kennedy rejected Donald's allegations solely because the objective medical evidence did not substantiate them. This was clear legal error.

\*

The regulations set out a two-step process for evaluating a claimant's alleged symptoms. *Lewis*, 858 F.3d at 865–66; 20 C.F.R. § 404.1529. "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms," *Lewis*, 858 F.3d at 866, "in the amount and degree[] alleged by the claimant." *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Step One is a "threshold" inquiry, at which the "'intensity, persistence, or functionally limiting effects' of the claimant's asserted pain" are not considered. *Id.* Assuming the claimant clears the first step of the *Craig* analysis, the ALJ moves on to Step Two. There, "the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit his ability," *Lewis*, 858 F.3d at 866, to work on a regular and continuing basis, *Mascio v. Colvin*, 780 F.3d 632, 637 (4th Cir. 2015);

14

*Hines*, 453 F.3d at 565; *see also* SSR 16-3p, 2016 WL 1119029, at *4 (Mar. 16, 2016). "The

second determination requires the ALJ to assess the credibility of [subjective] statements about

symptoms and their functional effects," *Lewis*, 858 F.3d at 866, after considering all the relevant

evidence in the record, 20 C.F.R. § 404.1529(c). "At this step, objective evidence is *not* required

to find the claimant disabled." *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 95 (4th Cir.

2020) (citing SSR 16-3p, 2016 WL 1119029, at *4–5). Rather, a claimant "[h]aving met his

threshold obligation of showing by objective medical evidence a condition reasonably likely to

cause the pain" alleged is then "entitled to rely exclusively on subjective evidence to prove the

second part of the test, *i.e.*, that his pain is so continuous and/or severe that it prevents him from

working a full eight hour day." *Hines*, 453 F.3d at 565 (footnotes omitted).

  The ALJ must give specific reasons, supported by "references to the evidence," for the

weight assigned to the claimant's statements. *Edwards v. Colvin*, No. 4:13cv1, 2013 WL

5720337, at *6 (W.D. Va. Oct. 21, 2013) (citing SSR 96-7p, 1996 WL 374186, at *2, *4–5 (July

2, 1996)). But because "[s]ymptoms cannot always be measured objectively through clinical or

laboratory diagnostic techniques," an ALJ "may 'not disregard an individual's statements about

the intensity, persistence, and limiting effects of symptoms solely because the objective medical

evidence does not substantiate' them." *Arakas*, 983 F.3d at 95 (quoting SSR 16-3p, 2016 WL

1119029, at *4–5); *see* 20 C.F.R. § 404.1529(c)(2). A reviewing court will uphold the ALJ's

credibility determination if his articulated rationale is legally adequate and supported by

substantial evidence in the record. *See Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th

Cir. 2014) (citing *Eldeco, Inc. v. NLRB*, 132 F.32 1007, 1011 (4th Cir. 1997)).

  Under this standard, I cannot find that ALJ Kennedy's reasons for discounting Donald's

complaints of back pain and related physical limitations are supported by substantial evidence.

ALJ Kennedy discounted Donald's report of symptoms and limitations because (1) he found they were inconsistent with the objective medical evidence showing a mix of normal and "mild" findings, and (2) Donald did not require surgery, braces, or devices to assist with walking and he "declined physical therapy and injection treatment, although that is all the objective findings and deficits call for." R. 18. Both reasons are grounded in the ALJ's assessment of the objective medical evidence.

"[O]nce objective medical evidence establishes a condition which could reasonably be expected to cause pain of the severity a claimant alleges, those allegations may not be discredited because they are not confirmed by objective evidence of the severity of the pain." *Craig*, 76 F.3d at 595. Thus, a finding of nondisabled is not warranted merely because the objective medical evidence does not align perfectly with the reported symptoms. *Lewis*, 858 F.3d at 866 (citing 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2)) ("[S]ubjective evidence of pain intensity cannot be discounted solely based on objective medical findings."). Rather, there must be some additional consideration supporting such a finding not based on the objective medical evidence. *Id.* Further, "the [ALJ] cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony." *Johnson*, 449 F.3d at 806. Thus, ALJ Kennedy could not rely on the objective medical evidence alone to find that Donald was not disabled, *Lewis*, 858 F.3d at 866. *Contra* R. 18 ("The claimant remains functional, as the physical examinations do not support persistent or significant deficits. The objective medical evidence does not support disability.").

ALJ Kennedy appears to reason that because Donald declined physical therapy and injection therapy, his pain must not have been as severe as claimed. *See* R. 18. The primary problem with the ALJ's reasoning, however, is that Donald participated in physical therapy and

underwent injections, and he reported that they were not effective in controlling his pain and even exacerbated his pain. R. 199, 238, 266, 272, 343. Despite Donald's report that these treatments were ineffective, Dr. Estrada did recommend that Donald undergo injections again, which Donald declined. When a claimant unreasonably refuses treatment recommended by a doctor, the ALJ may consider that refusal as a factor that raises questions about the severity of the claimant's impairments. 20 C.F.R. § 404.1530(a) ("If you do not follow the prescribed treatment without a good reason, we will not find you disabled."). But here, Donald's refusal was not necessarily unreasonable. He declined treatment that he had undergone previously and, according to Donald, had made his symptoms worse. On its face, this reason appears reasonable, but the ALJ did not mention it in his credibility analysis. *Compare* R. 16–17 (summarizing Donald's reports to physicians that "he did not improve with physical therapy" and felt "no improvement with the injections"), *with* R. 18. ("The claimant declined physical therapy and injection treatment, although that is all the objective findings and deficits call for."). Moreover, the ALJ did not cite any evidence that undermined Donald's reason. Instead, the ALJ again relied on the mild or minimal "objective findings and deficits," R. 18, to support his conclusion that Donald's report of symptoms was inconsistent with the recommended treatment. *See* R. 17–18.

Lastly, ALJ Kennedy credited the medical opinion of one DDS expert over the other based solely on his assessment of the objective evidence. R. 18. Although objective medical evidence is highly probative of a claimant's symptoms and limitations, ALJ Kennedy repeatedly cited it as the sole reason for crediting other important evidence in the record and in concluding Donald was not disabled. In assessing the medical opinions, the ALJ should consider all the relevant regulatory factors, *see Ledbetter v. Astrue*, No. 8:10cv195, 2011 WL 1335840, at *10

(D.S.C. April 7, 2011), and he must explain how he resolved the conflicting evidence and

reached his conclusion, *Woods*, 888 F.3d at 694 ("[T]he ALJ must both identify evidence that

supports his conclusion and build an accurate and logical bridge from that evidence to his

conclusion."). Here, ALJ Kennedy failed to do so. His discussion of Dr. Beazley's and Dr.

Camden's conflicting medical opinions is largely boilerplate and simply notes his conclusion that

Dr. Camden's opinion "is persuasive" because "it is consistent with the objective medical

evidence[] showing minimal strength limitations in the lower extremity, normal range of motion,

and normal sensation." R. 18. "But the ALJ never explained how he concluded—*based on this*

*evidence*—that [Donald] could actually perform the tasks required by 'medium work,' such as

lifting up to 50 pounds at a time, frequently lifting or carrying up to 25 pounds, or standing or

walking for six hours" in an eight-hour day. *Woods*, 888 F.3d at 694.

"A district court will not revisit the ALJ's resolution of conflicting evidence. However, if

the ALJ appears, without stating a reason, to have credited some probative evidence over other

evidence or to have ignored evidence altogether, a remand or reversal may be necessary."

*Hancock v. Barnhart*, 206 F. Supp. 2d 757, 764 (W.D. Va. 2002). Here, ALJ Kennedy did not

consider pertinent evidence, or did not explain how and why he weighed it in the manner he did.

As such, his decision cannot withstand scrutiny. *See Radford v. Colvin*, 734 F.3d 288, 295 (4th

Cir. 2013) ("The record should include a discussion of which evidence the ALJ found credible

and why, and specific application of the pertinent legal requirements to the record evidence.").

I take no position on whether Donald is entitled to disability benefits for the relevant

period. On remand, the Commissioner must consider and apply the applicable legal rules to all

the relevant evidence in the record, explain how any material inconsistencies or ambiguities were

resolved at each critical stage of the determination, and provide a logical link between the evidence the Commissioner found credible and the RFC determination.

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** Donald's Motion for Summary Judgment, ECF No. 15, **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 17, **REVERSE** the Commissioner's final decision, **REMAND** the case for further administrative proceedings under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket.

### <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Michael F. Urbanski, Chief United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: December 21, 2021

Joel C. Hoppe

U.S. Magistrate Judge